**Kouame Adonics KONAN, Petitioner**

v.

**ATTORNEY GENERAL OF THE UNITED STATES, Respondent.**

No. 04–3467.

United States Court of Appeals, Third Circuit.

Argued Oct. 20, 2005.

Dec. 30, 2005.

Nathaniel A. Vitan (Argued), Amanda P. Biles, Latham & Watkins LLP, Washington, D.C., for Petitioner.

Peter D. Keisler, Assistant Attorney General, Christopher C. Fuller, Senior Litigation Counsel, Office of Immigration Litigation, Paula K. Speck, Gretchen M. Wolfinger (Argued), Department of Justice, Washington, D.C., for Respondent.

Before SMITH, BECKER, and NYGAARD, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

Kouame Adonics Konan petitions for review of a decision by the Board of Immigration Appeals ("BIA"), denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Because we conclude that the BIA did not explain its rationale for denying Konan's claim that he was persecuted due to membership in a particular social group (his status as the son of a military police officer), there is, as of yet, nothing for us to review. Basic principles of administrative law thus require that we remand the case for the BIA to consider this claim in the first instance. We also find that substantial evidence does not support the BIA's conclusion that Konan did not suffer past persecution on account

of imputed political opinion. We will grant the petition for review.

## I. Facts

Konan was born in Bouake, Côte d'Ivoire, in 1980. He is a Catholic, a member of the Baoule tribe, and a supporter of President Laurent Gbagbo's government. His father was an officer in the Gendarmerie, the Ivorian military police force. Konan lived with his father and his brother in the Gendarmerie camp of N'Gattakro in Bouake ("the Gendarmerie camp" or "the camp") along with approximately 100 other gendarmes and their families. On September 19, 2002, rebel forces attacked the Gendarmerie camp, killing Konan's father and brother.

To put this attack in context, we provide a short summary of the recent history that gave rise to it, all of which is documented in the record. In December 1999, a group of "army mutineers" loyal to General Robert Guéi led a coup that overthrew President Konan Bédié. In a presidential election held the following year, the Ivorian Supreme Court disqualified all of the leading candidates except for Guéi and Gbagbo. Although Gbagbo won 51.9 percent of the vote, compared to Guéi's 28.7 percent, Guéi claimed victory. Guéi's attempted power grab triggered a popular uprising. Gbagbo was then declared the winner of the election, but that result was contested by followers of Alassane Dramane Ouattara, a former prime minister. Armed clashes began in which the government army and supporters of Gbagbo's party, the Front Populaire Ivoirien, were allied against Ouattara supporters. In 2001 and 2002, the various factions appeared to make progress toward reconciliation. Local elections were held without incident, and Bédié, Ouattara, and Guéi took part in a forum of national reconciliation. The economy seemed to be recovering, and a government of national unity was formed.

The situation changed suddenly on September 19, 2002, when junior officers who had once been affiliated with Guéi mutinied in three Ivorian cities: Abidjan, Korhogo, and Bouake. Bouake is the location of the N'Gattakro Gendarmerie camp where Konan lived. The rebels, comprised largely of Muslims, referred to themselves as the Mouvement Patriotique de la Côte d' Ivoire ("MPCI").[1] During the violence in Abidjan, Guéi was killed, allegedly by government assassins. There were also killings or attempted killings of other political leaders. The government suppressed the mutiny in Abidjan, but the rebels soon seized the northern half of the country. According to the State Department's 2003 Country Report on Côte d'Ivoire, "[t]he failed coup attempt and ongoing rebellion quickly escalated into the country's worst crisis since independence in 1960." Both the rebels and the government, including the gendarmes, committed rampant human rights abuses.

On the morning of September 19, Konan was engaged in his usual work: selling religious statues and cutting people's hair in the street. In the early afternoon, he heard gunfire coming from the camp, and ran toward it. Standing at the front entrance of the camp, Konan saw rebels attacking the camp with large guns and missile launchers. The gendarmes in the camp had only small pistols. Konan watched as the rebels shot through the hollow cement walls of his house, igniting the wooden furniture and propane tanks inside. Konan's father and brother were burned alive. Konan stated in his affidavit, "I could hear my father and brother screaming and there was nothing I could do. The rebels executed my father and my brother and destroyed my home."

---

1. A number of other rebel groups were also active in the September 19 uprising.

In October of 2002, government forces briefly recaptured Bouake. Believing, incorrectly, that the government had secured the city, a crowd came out to celebrate, but the rebels fired into the crowd and reportedly executed 100 gendarmes who had been captured in the initial rebel attack.

By this time, however, Konan was far from Bouake. After the attack on the Gendarmerie camp, Konan fled with hundreds of others, eventually encountering French troops who provided some protection. Konan reached Yamoussoukro, Côte d'Ivoire, where he spent eleven months in a refugee camp. French troops and Red Cross workers provided some assistance to the refugees. Konan moved to another camp, this time in San Pedro (also in Côte d'Ivoire) when he heard rumors that rebels planned to attack Yamoussoukro. He went to San Pedro's port, Zone Portuaire, because it was well-guarded by government forces. Even at the port, however, he would wake up "[e]very morning ... to find more dead bodies on the street," and he feared a rebel attack on San Pedro.

Konan learned of a cargo ship leaving Zone Portuaire, and he boarded the ship as a stowaway. Five days later, he emerged from hiding due to a severe toothache and was spotted by the crew. The ship arrived in Philadelphia, and Konan was taken into custody.

On February 8, 2004, Konan filed an application for asylum, and his case was assigned to an Immigration Judge (IJ). In the Immigration Court, Konan argued that he was entitled to asylum because he faced past persecution and had a well-founded fear of future persecution for reasons enumerated in 8 U.S.C. § 1101(a)(42)(A). First, Konan argued

that he faced persecution on account of his "membership in a particular social group," specifically, his status as the son of a gendarme. See 8 U.S.C. § 1101(a)(42)(A). Second, Konan contended that he faced persecution due to imputed "political opinion" in that he supports the Ivorian government. See Id. Konan also requested asylum on other bases, in addition to withholding of removal and relief under the Convention Against Torture, but he does not press these claims on appeal.[2]

On April 12, 2004, the IJ issued an oral decision. The IJ accepted Konan's account of the attack on the Gendarmerie camp, but denied all of Konan's claims. As addressed more fully below, the IJ did not discuss Konan's membership in a particular social group claim. He apparently rejected Konan's imputed political opinion claim on the ground that the attack on the Gendarmerie camp was a strike against the government itself, not an attempt to kill government supporters, relying on *Matter of Fuentes,* 19 I. & N. Dec. 658, 661–62 (BIA 1988) (holding that attacks on police officers viewed as extensions of the state do not constitute persecution). The BIA affirmed the IJ's decision without opinion.

## II. Jurisdiction and Standard of Review

We have jurisdiction to review the final order of the BIA under 8 U.S.C. § 1252. When the BIA affirms an IJ's decision without opinion, we review the IJ's decision as the final agency determination. *Berishaj v. Ashcroft,* 378 F.3d 314, 322 (3d Cir.2004). We consider whether findings of fact (including whether Konan has demonstrated past persecution or a well-found-

**2.** Konan's "petition for review focuses on his asylum claim and makes no specific argument that the BIA's denials of his claims for withholding of removal and CAT protection were

incorrect. We therefore deem those claims waived and address only the asylum claim." *Vente v. Gonzales,* 415 F.3d 296, 299 n. 3 (3d Cir.2005) (citation omitted).

ed fear of future persecution) are supported by substantial evidence. *Abdille v. Ashcroft,* 242 F.3d 477, 483 (3d Cir.2001). This standard requires great deference to the decisions of the BIA: "If a reasonable fact finder could make a particular finding on the administrative record, then the finding is supported by substantial evidence." *Dia v. Ashcroft,* 353 F.3d 228, 249 (3d Cir.2003); *see also I.N.S. v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

## III. Analysis

### A. Membership in a Particular Social Group

■ As this Court has explained, "[a] grant of asylum under § 1158(b)(1) of the Immigration and Nationality Act (INA) allows an otherwise removable alien to stay in the United States." *Gao v. Ashcroft,* 299 F.3d 266, 271 (3d Cir.2002). The Attorney General may grant asylum to a "refugee," 8 U.S.C. § 1158(b)(1), which is defined as "a person unable or unwilling to return to the country of that person's nationality or habitual residence because of past persecution or because of a well-founded fear of future persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion. *Gao,* 299 F.3d at 271–72; 8 U.S.C. § 1101(a)(42)(A). To show past persecution, an applicant must demonstrate " '(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control.' " *Id.* (quoting *Navas v. INS,* 217 F.3d 646, 655 (9th Cir.2000)).

■ An applicant who demonstrates past persecution is entitled to a presumption that he will suffer future persecution. 8 C.F.R. § 208.13(a)(1); *Mulanga v. Ashcroft,* 349 F.3d 123, 132 (3d Cir.2003).

"That presumption can be rebutted if the INS establishes by a preponderance of the evidence that the applicant could reasonably avoid persecution by relocating to another part of his or her country or that conditions in the applicant's country have changed so as to make his or her fear no longer reasonable." *Abdulrahman v. Ashcroft,* 330 F.3d 587, 592 n. 3 (3d Cir.2003) (citing 8 C.F.R. §§ 208.13(b)(1)(i) & (ii)).

■ Konan argues that the BIA failed to address his claim that he was persecuted due to membership in a particular social group. Specifically, in the Immigration Court, Konan asserted that he was persecuted because he is an immediate family member of a gendarme. He submits that because this claim was not considered by the IJ and the BIA affirmed the IJ's decision without opinion, the claim was never considered, hence the case must be remanded to the BIA.

■ It is a bedrock principle of administrative law that judicial review of an agency's decision is limited to the rationale that the agency provides. "[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Accordingly, a reviewing court is powerless to decide in the first instance issues that an agency does not reach.

In the immigration context, this principle is exemplified by *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam). In *Ventura,* the BIA denied an asylum application on the ground that the applicant failed to show persecution under 8 U.S.C. § 1101(a)(42)(A); therefore, the BIA did not reach the subsequent question of changed country conditions. *Id.* at 13–15, 123 S.Ct. 353. The United States Court of

Appeals for the Ninth Circuit rejected the BIA's finding that the applicant failed to show persecution and went on to decide the issue of changed circumstances. *Id.* at 13, 123 S.Ct. 353. The Supreme Court held that the Ninth Circuit had erred in reaching the issue of changed circumstances rather than remanding the case for the BIA to consider the issue in the first instance. *Id.* at 18, 123 S.Ct. 353.

This Court too has held that if the BIA fails to address one of an applicant's stated grounds for relief, the case must be remanded for the BIA to consider the claim. In *Vente v. Gonzales*, 415 F.3d 296 (3d Cir.2005), an applicant for asylum asserted that he faced persecution in that he had received death threats from paramilitary organizations. The BIA rejected this claim, finding that (1) the applicant could not claim asylum based on "general unrest in Columbia" and (2) members of the applicant's family who remained in Columbia had not been harmed. *Id.* at 299. We concluded that the BIA's findings "miss[ed] the mark" because findings regarding general unrest and the applicant's family did not address the applicant's claim that death threats were directed specifically at him. *Id.* at 301. This Court stated: " 'When deficiencies in the BIA's decision make it impossible for us to meaningfully review its decision, we must vacate that decision and remand so that the BIA can further explain its reasoning.' " *Id.* at 302 (quoting *Kayembe v. Ashcroft*, 334 F.3d 231, 238 (3d Cir.2003)). We therefore "remand[ed] th[e] case to the BIA for a fresh look at [the petitioner's] asylum claim—one that focuses on the true underpinnings of that claim." *Id.* at 302–03.

If the BIA failed to consider Konan's claim of persecution based on his status as an immediate family member of a gendarme, the case must be remanded under *Vente.* Therefore, we consider whether the BIA addressed this claim.

It is true that the IJ made a statement which, taken in isolation, might suggest that he rejected Konan's claim that he was persecuted because he is an immediate family member of a gendarme:

> I must in the end concur with Bureau counsel that there is no past persecution in this case. If respondent's father and brother died in the circumstances that he described, which is certainly tragic, but without more, I cannot conclude there was an act of persecution rather than an act of armed rebellion.

However, the IJ made this statement in the context of concluding that Konan was not persecuted due to political opinion, not in addressing his claim of persecution on account of his status as an immediate family member of a gendarme.

The IJ also discussed Konan's claim that he was persecuted on account of his membership in *another* social group, which Konan described as "future Ivorian internally displaced persons in the Ivory Coast who will refuse to fight for the rebels because of their government loyalty." However, because the IJ did not discuss Konan's separate claim that he was persecuted due to his status as an immediate family member of a gendarme, we cannot conclude that this claim was adequately considered. Therefore, we will remand the case for the BIA to consider this issue in the first instance.[3]

---

3. We do not consider whether substantial evidence *could* support a finding that Konan did not suffer past persecution due to his family ties; instead, under *Vente,* we must leave this task to the BIA. We note, however, that Konan made a compelling case which the government will likely have difficulty refuting on remand. Konan's evidence included: (1) a 2002 State Department Country Report, citing "reliable reports" that when government forces entered Bouaké after the September 19 coup attempt, "rebels executed a number of the sons of gendarmes"; (2) a November 2003 International Crisis Group report stating

## B. Imputed Political Opinion

■ Konan argues that the IJ, and hence the BIA, also failed to address his claim that he was persecuted due to imputed political opinion. Political opinion, like membership in a particular social group, is a protected ground, *see* 8 U.S.C. 1101(a)(42)(A). This Court has held that an applicant need not actually hold the views which his persecutors attribute to him. *See Singh v. Gonzales*, 406 F.3d 191, 196 (3d Cir.2005) ("In determining whether persecution existed on account of political opinion, we focus on whether the persecutor has attributed a political view to the victim and acted on that attribution.") (citation omitted).

Because the IJ discussed the claim that Konan was persecuted because the rebels imputed loyalty to the Gbagbo government to him and his family, Konan's argument essentially is that the IJ's treatment of the issue (and his rejection of the claim) were too opaque for us to grasp their meaning. Our best effort at a distillation of the IJ's

opinion is as follows.[4] The rebel assault on the Gendarmerie camp was an attack on the government's military police force, in essence, an attack on the government itself. The BIA held in *Matter of Fuentes*, 19 I. & N. Dec. at 661, that attacks on police officers as "extensions of the government's military forces or ... highly visible embodiments of the power of the state" do not constitute persecution. Konan's father and brother were killed because his father was a gendarme. Therefore, Konan did not suffer persecution due to imputed political opinion.

So long as the IJ's rationale is clear enough to permit review, our task is to review it, not to grade it. *See Awolesi v. Ashcroft*, 341 F.3d 227, 232 (3d Cir.2003) ("In order for us to be able to give meaningful review to the BIA's decision, we must have some insight into its reasoning."). We are reasonably confident that the distillation above accurately reflects the IJ's rationale. Thus, the IJ's opinion, while admittedly somewhat opaque, is

that during the September 19 attacks on Abidjan, "the rebels concentrated on the camps and schools of the gendarmerie and police"; (3) Konan's affidavit, in which he stated that during the attack on the gendarmerie, the rebels "used their large guns to randomly shoot throughout the camp. Everywhere homes were being destroyed and people were being killed"; (4) Konan's sworn statement in his Application for Asylum and for Withholding of Removal that "[t]he rebels target and have attacked gendarme and their families. My father was a member of the gendarme"; and (5) the affidavit of Thomas J. Bassett, a Professor of Geography at the University of Illinois, which states: "Mr. Konan was most likely targeted by the rebels because his father was a member of the gendarmerie. The gendarmes and their children were systematically executed in Bouaké ..."

**4.** Our distillation is based upon the following excerpt from the IJ's opinion:

Now the respondent's father was a gendarme and the rebels attacked him and others as the way the Court sees it embody-

ing the power of the state. This is general how civil war's are fought. Now I'm not classifying this event in September 2002 as a civil war since I think the evidence establishes it as a failed coup d'etat. But the difference in violence is perhaps on the one of scale. But the Board has ruled that being a police officer, for example, who has been targeted for violence by rebel or guerilla forces is not an act of persecution per se or without more. *See [Matter of Fuentes*, 19 I. & N. Dec. 658].

I must in the end concur with Bureau counsel that there is no past persecution in this case. If respondent's father and brother died in the circumstances that he described, which is certainly tragic, but without more, I cannot conclude there was an act of persecution rather than an act of armed rebellion.... *Matter of Fuentes* pointed out if police officers can legally claim persecution on account of their being targeted for violence and violent civil action, so too could rebels and hence everybody fleeing the civil war could be eligible for asylum.

clear enough to permit review. Accordingly, we consider whether substantial evidence supports the IJ's conclusion that Konan suffered persecution merely because his father was a gendarme (and therefore did not suffer persecution due to imputed political opinion).

In *Matter of Fuentes,* the BIA held that an applicant for asylum who was a former member of the Salvadorian national police could not claim persecution based on threats from leftist guerillas that resulted from his status as a police officer:

> As policemen around the world have found, they are often attacked either because they are (or are viewed as) extensions of the government's military forces or simply because they are highly visible embodiments of the power of the state. In such circumstances, the dangers the police face are no more related to their personal characteristics or political beliefs than are the dangers faced by military combatants.

*Matter of Fuentes,* 19 I. & N. Dec. at 661. While the IJ in this case apparently viewed the attack on the Gendarmerie camp as this sort of assault—one aimed solely at the state's military and police power—Konan argues that it was part of something else, "a calculated plan to ferret out and murder government loyalists."

If what Konan claims is true, the attack amounts to persecution on account of imputed political opinion. There is an important distinction between a plan to weaken the state by crippling its military and police power on the one hand and a plan to kill individuals who support the government on the other. In the case of particular police officers who are deemed to support the government, the question becomes whether they were attacked because they are police officers or because they are loyalists.

Therefore, we consider the evidence in the administrative record that bears on whether the attack was motivated by a desire to kill presumed government sympathizers because of their political views. Most importantly, the rebels attacked a camp where gendarmes lived *with their families,* and they indiscriminately attempted to kill everyone who lived there. Konan avers in his affidavit that during the attack on the Gendarmerie camp, the rebels did not aim specifically for gendarmes but "used their large guns to randomly shoot throughout the camp. Everywhere homes were being destroyed and people were being killed." He states that the rebels "have aimed their attacks at government officials and those suspected of supporting the government. Hence, they attacked my family, my home, and the gendarmerie camp where my father, brother, and I lived."

Extensive record evidence supports Konan's view that the camp was attacked because the rebels believed that it housed government loyalists. First, the State Department's 2002 Country Report states that when the rebels recaptured Bouake from the government, "northern sympathizers with the rebels reportedly killed six loyalists Baoules," the tribe to which Konan belongs, by "burn[ing] them to death by setting fire to tires placed around their necks." The Country Report describes gruesome incidents in other parts of the country, including murders of "a number of gendarmes and civilians thought to be loyal to the Government." The Country Report also states that following the September 19, 2002 attacks, "[t]here ... were credible reports of rebel soldiers or local recruits harassing and abusing with impunity local citizens, often on the basis of ethnic background and presumed political leanings."

Second, the State Department's 2003 Country report cites information that rebel soldiers beat or tortured Gbagbo support-

ers, that they imprisoned individuals considered to be "loyalist infiltrators," and that some prisoners were killed.

Third, according to Amnesty International's 2002 report on Côte d'Ivoire, rebel groups "summarily executed dozens of unarmed members of the security forces and others suspected of supporting the government." The report continues that rebels "called on the population to denounce anyone thought to be a military official or government sympathizer. Several such people were reportedly killed on the spot."

Fourth, Konan's own statements provide some support for the view that the rebels sought to kill government sympathizers by attacking the Gendarmerie camp. Konan asserts in a sworn statement in his Application for Asylum and for Withholding of Removal:

> Even if the rebels were unaware of my political views they would impute government loyalty on me because my father is a member of the gendarme and I am a Catholic. Because I am a son of a gendarme, a Catholic, a member of the Baoule tribe, and a government loyalist, I will be targeted by the rebels and killed, tortured, and or imprisoned.

Konan also submitted the affidavit of Professor Bassett, *see supra* note 3, which states: "The gendarmes and their children were systematically executed in Bouake because the gendarmes supported [President] Gbagbo's rise to power following the 2000 elections. The rebels viewed the gendarmes as their enemy for political and military reasons." The IJ stated that he would not give much weight to this affidavit because Professor Basset's primary expertise is in agriculture. Professor Bassett's curriculum vitae reveals that while he has written on African history, he indeed specializes in agriculture and ecology. This limits the significance of his affidavit but does not undermine it completely.

While the IJ found that the attack on the Gendarmerie camp was not motivated by a desire to kill presumed government supporters, he did not cite any evidence in support of this conclusion, other than the general fact that the attack was part of an armed uprising. The government called no witnesses in the Immigration Court, and its only evidence consisted of a map of Côte d'Ivoire, Konan's Application for Asylum, Konan's "record of deportable alien" form, and various State Department reports.

We do not doubt that the rebels attacked the Gendarmerie camp in part because they viewed the gendarmes as extensions of the state, which they sought to overthrow. Standing alone, this does not constitute persecution under *Matter of Fuentes*. However, we bear in mind that Konan need not demonstrate that the desire to kill loyalists was the sole motivation for the attack. "A persecutor may have multiple motivations for his or her conduct, but the persecutor must be motivated, at least in part, by one of the enumerated grounds." *Lukwago v. Ashcroft*, 329 F.3d 157, 170 (3d Cir.2003). Thus, we consider whether the desire to kill presumed government loyalists was a motivation for the attack.

The evidence in the record demonstrates that during the September 19 attacks and their aftermath, rebels sought to kill government loyalists in several areas in Côte d'Ivoire. There is also evidence specific to Bouake: rebels burned government supporters to death after retaking the city. When the attack on the Gendarmerie Camp is viewed against this background, it becomes clear that the desire to kill government supporters was a factor motivating the assault. Critically, the rebels attacked a camp where gendarmes lived with their families. The rebels did not aim only for gendarmes but shot randomly into the camp, killing gendarmes' family members,

including Konan's brother. This evidence demonstrates that the attack on the Gendarmerie camp was motivated, at least in part, by a desire to kill presumed government loyalists because of their political beliefs.

As the government correctly asserts, "general conditions of civil unrest or chronic violence and lawlessness do not support asylum." Indeed, this Court has stated, " 'Mere generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient to permit the Attorney General to grant asylum....' " *Abdille v. Ashcroft*, 242 F.3d 477, 494–95 (3d Cir.2001) (quoting *Singh v. INS*, 134 F.3d 962, 967 (9th Cir.1998)).

On the other hand, while general unrest and violence will not support an asylum claim standing alone, persecution on account of political opinion may occur in the context of widespread violence. While "determining motive in situations of general civil unrest" is difficult, that should not "diminish the protections of asylum for persons who have been punished because of their actual or imputed political views...." *In re S–P–, Applicant*, 21 I. & N. Dec. 486, 493 (BIA 1996). We believe that the evidence cited above, none of which is contradicted, demonstrates that although the attack on the Gendarmerie camp occurred in the context of general civil unrest, it was motivated, at least in part, by a desire to kill presumed government loyalists. Applying the substantial evidence test, this evidence "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812; *see also Dia*, 353 F.3d at 249. We therefore hold that the BIA's finding that Konan did not suffer past persecution due to imputed political opinion is not supported by substantial evidence.[5]

5. Because the BIA concluded that Konan did not suffer past persecution for a reason enumerated by 8 U.S.C. § 1101(a)(42)(A), it was unnecessary for the BIA to consider whether country conditions had changed or whether Konan could safely relocate to another area in Côte d'Ivoire under 8 C.F.R. § 208.13(b)(1)(i)(A) & (B). The IJ appeared to consider these issues nonetheless. Because we are remanding the case for consideration of both claims that Konan presses on appeal, we need not decide whether this was error.

For the same reason, we do not reach Konan's argument that the BIA's decision to streamline the administrative appeal (that is, to approve it without opinion) was arbitrary and capricious. *See Smriko v. Ashcroft*, 387 F.3d 279, 293–94 (3d Cir.2004) (stating that the BIA's decision to streamline a case is reviewed under the arbitrary and capricious standard). Under the streamlining procedure, the single member of the BIA to whom a case is referred may streamline it only if he or she determines, *inter alia*, that "[t]he issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation." 8 C.F.R. § 1003.1(e)(4)(i)(A).

As discussed above, the IJ neglected to discuss Konan's claim that he was persecuted because he is an immediate family member of a gendarme. We note, however, that properly considered, this claim appears to raise a novel legal issue that has not been decided by the BIA or by a precedential opinion of this Court: whether persecution on account of family ties constitutes persecution on account of membership in a particular social group under 8 U.S.C. § 1101(a)(42)(A). Several Courts of Appeals have held family ties constitute membership in a particular social group. *See, e.g., Lopez–Soto v. Ashcroft*, 383 F.3d 228, 235–236 (4th Cir.2004) (holding that family constitutes a particular social group, and stating that "our sister circuits that have considered the issue all appear" to have reached the same conclusion); *Thomas v. Gonzales*, 409 F.3d 1177, 1180 (9th Cir.2005) (holding that family represents a particular social group), reh'g en banc granted, 382 F.3d 1154; *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir.1993) ("There can, in fact, be no plainer example of a social group based on common, identifiable

## IV. Conclusion

For the foregoing reasons, we will grant the petition for review, vacate the IJ's decision with respect to Konan's asylum claims based on imputed political opinion and his status as an immediate family member of a gendarme, and remand for further consideration in light of this opinion.

and immutable characteristics than that of the nuclear family.'').