

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-15-2006

# Gaie v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4237

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

## Recommended Citation

"Gaie v. Atty Gen USA" (2006). *2006 Decisions.* Paper 1112.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1112

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 04-4237 and 05-2121

———

LEA VIVIANE GAIE
                        Petitioner
v.

ATTORNEY GENERAL OF THE UNITED STATES
                        Respondent

———

Petition for Review of an Order
of the Board of Immigration Appeals
(A96-248-534)
Immigration Judge: Henry S. Dogin

———

Argued February 28, 2006

Before: SLOVITER, FUENTES, Circuit Judges, and BRODY,[*] District Judge

(Filed: May 15, 2006)

———

———

[*] Hon. Anita B. Brody, United States District Court for the
Eastern District of Pennsylvania, sitting by designation.

Joseph C. Hohenstein   (Argued)
Orlow & Orlow
620 Chestnut Street
Suite 656
Philadelphia, PA l9l06

      Attorney for Petitioner

James B. Clark, III   (Argued)
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Jonathan Potter
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878, Civil Division
Washington, DC 20044

      Attorneys for Respondent

OPINION

SLOVITER, Circuit Judge.

**I.**

Petitioner, Lea Viviane Gaie, is a native and citizen of Côte d'Ivoire. On April 27, 2002, she entered the United States on a non-immigrant business visa with permission to remain for three months. Although trained as a nurse, Gaie entered this country seeking to purchase electronic equipment for re-sale in Côte d'Ivoire. Gaie applied for an extension of her visa but later chose not to pursue that application and overstayed without authorization. She conceded removability before an Immigration Judge (IJ), and applied

2

for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).

Gaie's claims for relief from removal arise out of the recent political turmoil in Côte d'Ivoire.  This court has summarized the pertinent country conditions as follows:

> In December 1999, a group of "army mutineers" loyal to General Robert Guéi led a coup that overthrew President Konan Bédié. In a presidential election held the following year, the Ivorian Supreme Court disqualified all of the leading candidates except for Guéi and Gbagbo. Although Gbagbo won 51.9 percent of the vote, compared to Guéi's 28.7 percent, Guéi claimed victory.  Guéi's attempted power grab triggered a popular uprising.  Gbagbo was then declared the winner of the election, but that result was contested by followers of Alassane Dramane Ouattara, a former prime minister.  Armed clashes began in which the government army and supporters of Gbagbo's party, the Front Populaire Ivoirien, were allied against Ouattara supporters.  In 2001 and 2002, the various factions appeared to make progress toward reconciliation.  Local elections were held without incident, and Bédié, Ouattara, and Guéi took part in a forum of national reconciliation.  The economy seemed to be recovering, and a government of national unity was formed.
>
> The situation changed suddenly on September 19, 2002, when junior officers who had once been affiliated with Guéi mutinied in three Ivorian cities: Abidjan, Korhogo, and Bouake. . . .  During the violence in Abidjan, Guéi was killed, allegedly by government assassins.  There were also killings or attempted killings of other political leaders.  The government suppressed the mutiny in Abidjan, but the rebels soon seized the northern half of the country.  According to the State Department's 2003 Country Report on Côte d'Ivoire, "[t]he failed coup attempt and ongoing rebellion quickly escalated into the country's worst crisis since independence in 1960."  Both the rebels and the government, including the gendarmes, committed rampant human rights abuses.

3

Konan v. Att'y Gen., 432 F.3d 497, 499 (3d Cir. 2005) (footnote omitted).

Gaie makes no claim of past persecution, but she fears returning to Côte d'Ivoire due to the violence of September 2002 and its aftermath. Gaie asserts that General Robert Guéi, the one-time military ruler of Côte d'Ivoire who was murdered in September 2002, was her "uncle."[1] General Guéi allegedly had helped Gaie by recommending her admission to nursing school. On September 28, 2002, Gaie also learned that the father of her two children, Jean Tise, was murdered, allegedly by "rebels" who believed that Tise was related to General Guéi. Gaie's mother fled to Guinea with Gaie's two children following the violence of September 2002 but has since returned with the children to Côte d'Ivoire. Gaie's father, Mathias, who is not married to Gaie's mother, is allegedly in hiding in the city of Abidjan. Mathias's house was ransacked as a result of the death of General Guéi. Gaie's cousin, Antoinette Roberts, appeared as a witness in the hearing before the IJ and testified to the alleged family tie to General Guéi. Gaie claims that she fears future persecution, either by government forces or by the rebels, on account of her familial relationship to General Guéi and because of the murder of Jean Tise.

The IJ denied Gaie's applications for relief, noting primarily that Gaie failed to

---

[1]Although Gaie testified that General Guéi was her "uncle," she explained the family relationship by noting that General Guéi and her father were "cousins." App. at 125, 144-45. In her asylum application, Gaie stated, "I believe my father and Gen. Gu[é]i are actually cousins, as relations are counted in America, but in Africa, they would be counted as brothers, and I would be counted as his niece." App. at 239.

4

corroborate the testimony regarding her alleged relationship to General Guéi. Among other things, the IJ observed that Gaie's last name is spelled G-A-I-E while the General's name was spelled G-U-E-I and her father Mathias's name is spelled both G-A-I-E and G-U-E-Y-E. With no documentation linking Mathias to General Guéi, the IJ was unconvinced that the claimed relationship existed. Even assuming a relationship, the IJ was unconvinced that Gaie would be persecuted as a result, or that Gaie's testimony was credible. The IJ found "inexplicable" Gaie's failure to mention Jean Tise's murder in her asylum application. Gaie also failed to mention her mother's exodus to Guinea or that her father was in hiding. The IJ observed that Gaie has relatives in Côte d'Ivoire who remain unharmed, and that Gaie failed to establish how and why General Guéi was killed, thereby undermining her claim that she would be at risk.

On October 5, 2004, the BIA summarily affirmed the IJ's decision. Gaie filed a timely petition for review, which this court docketed as C.A. No. 04-4237. Gaie also filed a motion to reconsider with the BIA in which she argued that the IJ failed to consider her explanations for the omissions in her application, expected corroboration that would have been difficult to obtain, and ignored problems in translation at the hearing. On March 9, 2005, the BIA rejected the motion to reconsider, concluding that Gaie sought to reiterate arguments made on her appeal. Gaie's timely petition for review from that order was docketed as C.A. No. 05-2121. We have consolidated the petitions for review for disposition.

5

This court has jurisdiction under 8 U.S.C. § 1252(a)(1). Because the BIA affirmed the final order of removal without any independent analysis, we review the IJ's decision. Xie v. Ashcroft, 359 F.3d 239, 242 (3d Cir. 2004). Our review is conducted under the deferential substantial evidence standard. Caushi v. Att'y Gen., 436 F.3d 220, 225 (3d Cir. 2006). We must accept the IJ's findings as conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see Dia v. Ashcroft, 353 F.3d 228, 249 (3d Cir. 2003) (en banc) ("If a reasonable fact finder could make a particular finding on the administrative record, then the finding is supported by substantial evidence.").

The Attorney General may grant asylum to a "refugee," 8 U.S.C. § 1158(b)(1), a term defined in relevant part as a person unable or unwilling to return to the country of that person's nationality or habitual residence because of "a well-founded fear of persecution on account of . . . membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). The IJ held that Gaie can be considered for asylum as a member of a "particular social group" based on kinship to General Guéi, but denied relief because Gaie failed to establish her membership in that social group given the absence of any evidence to corroborate her testimony regarding the familial relationship.[2]

_____

[2]The BIA has interpreted "particular social group" as including kinship ties. See Fatin v. INS, 12 F.3d 1233, 1239-40 (3d Cir. 1993).

In Abdulai v. Ashcroft, 239 F.3d 542, 554 (3d Cir. 2001), we held that an IJ may require an otherwise credible alien to supply corroborating evidence, but only if it would be reasonable to expect corroboration. An alien who fails to introduce such evidence, or to offer a satisfactory explanation for the failure, can be held to have failed to meet the burden of proof. Id. at 551. It is reasonable, for example, to expect the alien to corroborate facts central to the claim and easily subject to verification. Id. at 554. Under the REAL ID Act of 2005, "[n]o court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4).

Gaie's alleged familial relationship to General Guéi is the cornerstone of her asylum claim, and we see no error in the IJ having sought reasonably available corroboration to support Gaie's testimony on the subject. Gaie contends that because of the civil strife, it was unreasonable to expect family members to gather birth records or other official documentation in Côte d'Ivoire. However, even if we assume the impossibility of procuring government-issued documents, it was not unreasonable for the IJ to expect corroboration in the form of affidavits from family members. The record is clear that Gaie has remained in contact with her mother since the violence of September 2002; that she has been in contact with her father; and that she has relatives, including two of her father's brothers, whom she could attempt to contact in France. None of those

7

individuals produced an affidavit regarding Gaie's alleged relationship to General Guéi. When asked at the asylum hearing whether she had documentation to establish that her father was related to General Guéi, Gaie responded, "No, because when I came to the United States I did not – I was not thinking in terms of that I would be asked that." App. at 156. Gaie further testified that she had made no effort to get documentation from her relatives in France. Moreover, although Gaie presented the testimony of her alleged cousin, Antoinette Roberts, the IJ reasonably discounted that testimony because Roberts failed to produce any documentation to establish her own identity much less the existence of a kinship tie between Gaie and General Guéi. We find substantial evidence to support the IJ's finding that Gaie could have and should have produced corroborating evidence of her alleged relationship to General Guéi.

Additionally, the IJ questioned the truthfulness of Gaie's testimony given the various omissions of relevant evidence from her asylum application. The IJ noted, inter alia, that Gaie failed to mention in her application the murder of Jean Tise – an event upon which Gaie expressly relied at the hearing to support her claim that she fears a return to Côte d'Ivoire. Gaie contends, as she did before the IJ, that she honestly believed that Tise was not a "family member" and that information about his death was non-responsive to the question posed in the asylum application. She also claims that she did not learn that Tise was killed (as opposed to merely kidnapped) until just prior to the asylum hearing.

8

Gaie completed her asylum application with the assistance of counsel, and the application question at issue is broadly worded: "Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?" App. at 239. Tise, as the father of Gaie's two children, certainly fits within the class of people contemplated by the question. In addition, Gaie testified that she learned that Tise had "disappeared" in September 2002, which was prior to her completion of the application in December 2002. Thus, while she had not yet received confirmation that Tise was dead (a fact she allegedly learned in June 2003), Gaie certainly could have included information about Tise's disappearance in her asylum application, particularly because she claimed that the alleged mistreatment of Tise based on his perceived relationship to General Guéi was a factor behind her fear of returning to Côte d'Ivoire.

Gaie suggests that "translation and interpretation issues" at the asylum hearing may have limited the extent to which she was able to explain herself to the IJ. Gaie notes that her native language is Krahn and that her interpreter for the proceedings spoke French. Gaie seems to suggest that problems with interpretation should have compelled the IJ, sua sponte, to postpone the proceedings until a Krahn interpreter could be provided. This argument lacks merit. Gaie told the IJ at the outset of the hearing that she spoke French, and when asked if she understood the French interpreter, she replied, "Yes, we understand each other real good." App. at 117. Gaie's counsel raised no objection to use of a French interpreter, and the IJ expressed no difficulty in understanding Gaie's

9

testimony. Moreover, Gaie has failed to identify where in the record there is evidence to show that she was misunderstood or misinterpreted, and she has not explained how her testimony would have been different were it interpreted from Krahn as opposed to French.

In sum, we conclude that substantial evidence supports the IJ's denial of asylum. Gaie's claim for withholding of removal was also properly rejected, as it required an even greater showing to warrant relief. See Senathirajah v. INS, 157 F.3d 210, 215 (3d Cir.1998). Gaie's CAT claim, which required a showing that it is more likely than not that she would be tortured upon return to Côte d'Ivoire, 8 C.F.R. § 1208.16(c)(4), was properly rejected, as Gaie predicated the claim upon her unsubstantiated relationship to General Guéi. Moreover, Gaie has waived her CAT claim by failing to argue it in her appellate brief. See Lie v. Ashcroft, 396 F.3d 530, 532 n.1 (3d Cir. 2005). Finally, we note that Gaie makes no express argument to challenge the BIA's denial of her motion to reconsider, and thus we deem that issue waived, as well.

**III.**

For the reasons stated, we will deny the petitions for review.