

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-7-2007

# Valdiviezo-Galdamez v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 06-2080

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

## Recommended Citation

"Valdiviezo-Galdamez v. Atty Gen USA" (2007). *2007 Decisions.* Paper 347.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/347

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-2080

MAURICIO VALDIVIEZO-GALDAMEZ,
Petitioner

v.

ATTORNEY GENERAL
OF THE UNITED STATES,
Respondent

Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A97-447-286)
Immigration Judge:  Honorable Mirlande Tadal

Argued July 10, 2007

Before:  RENDELL and AMBRO, <u>Circuit</u> <u>Judges</u>,
and SHAPIRO, * <u>District</u> <u>Judge</u>.

(Filed   September 7, 2007  )
––––––––––––

Martin P. Duffey     **[ARGUED]**
Cozen & O'Connor
1900 Market Street, 3rd Floor
Philadelphia, PA  19103

Ayodele Gansallo
HIAS & Council Migration Service
of Philadelphia
2100 Arch Street, 3rd Floor
Philadelphia, PA  m19103
   *Counsel for Petitioner*

Colette R. Buchanan     **[ARGUED]**
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ  07102

––––––––––––––––––

   **\***Honorable Norma L. Shapiro, Senior Judge of the United
States District Court for the Eastern District of Pennsylvania,
sitting by designation.

2

Janice K. Redfern
United States Department of Justice
Office of Immigration
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
    *Counsel for Respondent*

---

OPINION OF THE COURT

---

RENDELL, <u>Circuit Judge</u>.

Mauricio Edgardo Valdiviezo-Galdamez ("Galdamez") petitions for review of the denial of his applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We will grant the petition for review, and remand for further proceedings consistent with this opinion.

I.

Galdamez is a native and citizen of Honduras, born in May 1984.[1] He came to the United States in October 2004 and was not admitted or paroled after inspection by an immigration

---

[1]The opinion of the Immigration Judge mistakenly states that Galdamez was born in May 1981.

officer. Removal proceedings commenced in January 2005. Galdamez admitted removability, but submitted an application for asylum and for relief under the CAT. A hearing was held before an Immigration Judge ("IJ") on May 16, 2005.

Galdamez testified that he fled Honduras because members of a gang called "Mara Salvatrucha" threatened to kill him if he did not join the gang. App. 11. Galdamez testified that the young men in the gang engage in drug trafficking and, on occasion, murder. According to Galdamez, the gang members began making threats against him in March 2003, while Galdamez was living in the City of San Pedro Sula in Honduras. One day as Galdamez was leaving work, six men approached him and robbed him. The men told Galdamez that if he wanted his money and jewelry back, he would have to join their gang. App. 142. After Galdamez refused, the men hit him and told him to think about their proposal. Galdamez knew that the men were members of Mara Salvatrucha because of their tattoos.

Galdamez reported the incident to the police three days later. He delayed going to the police because he was afraid to leave his house. After this incident, Galdamez moved to live with his mother in Santa Rosa de Cupon because he was afraid that the gang would come after him again in San Pedro Sula. He testified that he did not leave his mother's house during the three months that he stayed in Santa Rosa. App. 173. However, he returned to San Pedro Sula in June 2003 because he received an offer of employment. He testified that he did not think that he could find work in Santa Rosa because the village is largely agricultural and most people are farmers. App. 181.

4

He testified that he was afraid to stay in Santa Rosa because some of his former classmates who live there are gang members and he feared that they would find out that he was in town. App. 174.

After Galdamez returned to San Pedro Sula, he tried to avoid the members of Mara Salvatrucha and moved to a different colony within the city. However, the gang members spotted him and continued to threaten him. App. 176. The gang members shot at him, and threw rocks and spears at him about two-to-three times per week. Galdamez ran away and his attackers screamed at him "Don't run. Don't be afraid. Sooner or later you will join us." A143-44, 178. Galdamez was able to identify some of the men, either by the gang nicknames inscribed in their tattoos or because they addressed one another by those nicknames. Galdamez testified that he was not injured in these attacks because he tried not to give the attackers an opportunity to do so. He filed five separate police reports about these incidents, but received no response from the police. App. 177, 147 ("The[ police] would always tell me that they were in process, that they were investigating but we weren't able, able to see anything happen.").

Galdamez testified that on September 10, 2004, when he was on his way to visit his sister's husband in Guatemala, he was kidnaped by Mara Salvatrucha members after crossing the border into Guatemala. Galdamez was traveling with his mother and other family members in a two-car caravan from Honduras to Guatemala. After they crossed into Guatemala, a pick-up truck began following the caravan. The car in which Galdamez was traveling was stopped by the men in the truck,

5

who Galdamez identified as gang members by their tattoos. The men kidnaped Galdamez and his fellow passengers and took them to a mountain area. The gang members asked Galdamez what he was doing in Guatemala, and he responded that he was only traveling. He testified that his abductors thought that he was trying to escape being a gang member. He was told by the gang members that "they [would] no longer offer me to be a part of the Mara but that they would kill me." App. 147. Galdamez was tied up and beaten by the gang members and held for five hours.

Galdamez was eventually freed by the Guatemalan police, who were alerted to the attack by Galdamez's family members traveling in the second car in the caravan, which was not stopped by the gang members. Galdamez filed a complaint with the Guatemalan police, but nothing came of it. App. 163 ("[T]he Guatemalan police told us that they would protect us until the place that we were going. And then, then the chief of police arrived and said that's – this is not our problem. You can fix this whichever way you want. You're not from this country."). Galdamez then briefly stayed in Guatemala with his sister's husband, and decided to come to the United States to escape the Mara Salvatrucha members. He testified that he believes that the gang members will kill him if he returns to Honduras. App. 150. He also testified that he believes that his family will be attacked if he returns to Honduras and continues to refuse to join the gang.

After a hearing, the IJ denied Galdamez's applications for asylum, withholding of removal, and relief under the CAT. The IJ found no reason to disbelieve Galdamez's testimony.

However, the IJ offered three purported failures in Galdamez's proof. First, Galdamez did not establish that the government "refused" to protect him from the attacks by Mara members and that the refusal was on account of one of the five grounds enumerated in the Immigration and Nationality Act (i.e., Galdamez's race, religion, nationality, membership in a particular social group, or political opinion). The IJ noted that Galdamez left San Pedro Sula almost immediately after filing the police report concerning the March 2003 attack and concluded that "[s]ubstantial evidence does not indicate that the government or the police refused protection to the respondent against these individuals." App. 19.

Second, the IJ found that Galdamez failed to establish that the injuries he sustained in Honduras were inflicted "on account of" his race, religion, nationality, membership in a particular social group, or political opinion. She stated, without discussion, that "[t]here is no evidence that these criminal elements [] imputed any political opinion on the respondent or that they sought to harm the respondent on account of any one of the five grounds delineated in the Act." App. 20. Lastly, the IJ noted that Galdamez had lived in Santa Rosa without problems and faulted Galdamez for failing to establish that the danger of "persecution" at the hands of the gang members was countrywide.

On these grounds, the IJ concluded that Galdamez failed to prove his eligibility for asylum, and, accordingly, also failed to meet the higher burden required to prove eligibility for withholding of removal. Furthermore, the IJ found that

7

Galdamez presented no evidence that he would be tortured if he returned to Honduras and so was not eligible for relief under the CAT. The Board of Immigration Appeals ("BIA") summarily affirmed the decision of the IJ. Galdamez then filed this petition for review.

## II.

We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). When the BIA affirms the IJ's decision without opinion, we review the IJ's decision. *See Partyka v. Att'y Gen.*, 417 F.3d 408, 411 (3d Cir. 2005). The IJ's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. 8 U.S.C. § 1252(b)(4)(B).

### A. Asylum

To prove eligibility for a grant of asylum, a petitioner must establish that he is "a refugee," meaning a "person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). "In order to establish past or future persecution, an applicant must 'show past or potential harm rising to the level of persecution on account of a statutorily enumerated ground that is committed by the government or by forces the government is unable or unwilling to control.'" *Kibinda v. Att'y Gen.*, 477 F.3d 113, 119

(3d Cir. 2007).

The IJ denied Galdamez's claim for asylum on three grounds: his failure to establish that the government "refused" to protect him from his persecutors, his failure to prove that the injuries that he sustained were inflicted "on account of" one of the five statutory grounds, and his failure to show that the danger of persecution is countrywide. We will address each of these grounds in turn.

## 1. Government Action

If the alleged persecution was not conducted directly by the government, the petitioner has the burden to prove that it was conducted "by forces the government is unable or unwilling to control." *Kibinda*, 477 F.3d at 119. Galdamez argues that the IJ erred by requiring him to prove, not that the government was "unable or willing" to protect him, but that the government "refused" to protect him. App. 19 ("Substantial evidence does not indicate that the government or the police refused protection to the respondent against these individuals.").

We agree that the IJ erred by requiring Galdamez to prove that the police "refused" to protect him, rather than that the government was simply "unable or unwilling" to protect him. App. 19 ("The Court must look to see whether or not the police officials intentionally decided not to protect the respondent against these individuals. Substantial evidence does not indicate that the government or the police refused protection to the respondent against these individuals."). The IJ further erred by placing the burden on Galdamez to prove *both* that the

9

police refused to protect him from the gang members and that this refusal was "on account of" Galdamez's race, religion, nationality, membership in a particular social group, or political opinion. App. 20 ("Based on the evidence presented it would not support a finding that the police refused protection to the respondent and the refusal was on account of any one of the five enumerated grounds in the Act."). The petitioner must prove that persecution that he fears is "on account of" one of the enumerated grounds, but need not show that the government's refusal to control a group that engages in persecution is "on account of" one of these grounds. *See In re R-A-*, 22 I. & N. Dec. 906, 923 (BIA 2001) ("[We] understand the 'on account of' test to direct an inquiry into the motives of the entity actually inflicting the harm.").

We also note that the IJ ignored several important pieces of evidence in the process of making this finding, evidence that would support a finding that the police were "unwilling or unable" to protect Galdamez from the gang members. The IJ made no mention of the evidence that Galdamez filed five police reports concerning the gang members' attacks against him or the evidence that the police failed to take any action in response to these reports. The IJ discussed only the police report that Galdamez filed in March 2003 and the police follow-up to that report. The IJ did not consider Galdamez's testimony that, after June 2003, he had filed five additional police reports about incidents in San Pedro Sula, in which he was able to identify some of his attackers by their gang nicknames. Galdamez

10

received no response from the police.[2]  Accordingly, the IJ erred by applying the wrong legal standard, and compounded this error by ignoring evidence in the record supporting Galdamez's claim that the police were "unwilling or unable" to protect him from the gang members.

## 2.  "On Account of" an Enumerated Ground

The IJ also denied Galdamez's request for asylum on the ground that Galdamez "failed to establish that the injuries that

---

[2]We cannot accept the government's contention that the background materials submitted at the hearing support the IJ's finding and denial of the asylum claim.  First, the IJ did not address the relevant question: whether the government was "unwilling or unable" to control the gang members.  Second, the materials referenced by the government describe the general negative attitude in Honduras towards "street children" and youths with tattoos, and do not describe with any detail efforts by the government to crack down on gangs.  App. 249-52, 309-10.  The most relevant statement in these materials is that: "During the year, nearly half of all military personnel were assigned for most of the time to joint patrols with police to prevent and combat high levels of criminal and gang violence."  App. 310.  This does not refute Galdamez's credible testimony, which the IJ failed to address, that the police took no action in response to his complaints that he was repeatedly attacked by gang members.  If anything, the evidence that gang violence is a serious problem in Honduras provides additional support for Galdamez's claims.

11

he sustained in Honduras [were] on account of one of the five grounds delineated in the Act." App. 20. Galdamez argued before the IJ that he is a member of the particular social group of young Honduran men who have been actively recruited by gangs and who have refused to join the gangs.[3] He maintained that he was persecuted because he is a member of this group. However, the IJ never referred to the social group claim, but stated in conclusory fashion that the attacks on Galdamez had "no nexus to a protected ground." App. 20. We conclude that the IJ's finding that Galdamez was not persecuted "on account" of his membership in this group is not supported by substantial evidence.

The government contends that we should deny the petition for review and affirm the denial of asylum on the ground that the group to which Galdamez belongs is not a "particular social group" within the meaning of the Immigration

[3]Before the IJ, Galdamez identified the particular social group to which he belongs as "those who have been actively recruited by gangs but have refused to join because they oppose these gangs." App. 185. In his brief, he identifies the group as "young Honduran men who have been actively recruited by gangs and who have been persecuted by these gangs for their refusal to accept membership." Appellant's Br. 25. In discussing the group, we omit the fact of the group's later persecution from its definition to make clear that the group exists independently of its persecution. *See Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003) ("[T]he 'particular social group' must have existed before the persecution began.").

12

and Nationality Act. However, neither the IJ nor the BIA decided whether the group of which Galdamez claims to be a member – "young Honduran men who have been actively recruited by gangs and who have refused to join the gangs" – is a "particular social group" within the meaning of the Act. We decline to decide this question in the first instance. *See Gonzales v. Thomas*, 547 U.S. 183 (2006) (holding that court of appeals erred by holding in the first instance that members of a family are a "particular social group" without prior resolution of this issue by the BIA). The IJ denied Galdamez's application for asylum based not on a finding that Galdamez did not belong to a "particular social group," but rather based on her finding that there was no "nexus" between the injuries Galdamez endured and any protected ground. We conclude that this finding as to a lack of a link, or causation, is not supported by reasonable, substantial and probative evidence on the record considered as a whole, and we will therefore vacate the order of removal and remand to the agency.

"We will not disturb the IJ's credibility determination and findings of fact if they are 'supported by reasonable, substantial and probative evidence on the record considered as a whole.' Although we generally defer to the IJ's inferences, 'deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole.'" *Tarrawally v. Ashcroft*, 338 F.3d 180, 184 (3d Cir. 2003) (internal citations omitted) (quoting *Balasubramanrim v. INS,* 143 F.3d 157, 161, 162 (3d Cir. 1998)). Here, the IJ's finding that Galdamez was not attacked on account of his membership in the group of "young Honduran men who have been actively recruited by gangs and who have

13

refused to join the gangs" is inconsistent with her finding that the individuals who attacked Galdamez wanted him to join the gang and engage in gang activities, and the IJ's specific recognition that Galdamez's "refusal caused [him] to be attacked by these men." App. 20. Indeed, there is no evidence in the record that the gang members attacked Galdamez for any reason other than he is a young man who has repeatedly refused to join the gang after being actively recruited to join. The gang members sought out Galdamez again and again, and targeted him for abuse based on his status as a member of this group. As the gang members chased him, Galdamez's persecutors shouted "Don't run. Don't be afraid. Sooner or later you will join us." App. 143-44. No reasonable factfinder could conclude that Galdamez was attacked for any reason other than his status as a young Honduran man who had been recruited to join the gang and refused to join. Thus, we hold that the IJ's finding that there was no "nexus" between Galdamez's injuries and any of the statutory grounds is not supported by substantial evidence.

It is curious that the IJ failed to address Galdamez's claim based on membership in a "particular social group," given that the BIA's decisions in this area, and the decision of at least one IJ, support Galdamez's position. The group in which Galdamez claims membership shares the characteristics of other groups that the BIA has found to constitute a "particular social group." The BIA has read the term "particular social group" to mean that the group must be defined by a common, immutable characteristic that the group members "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (quoting *Matter of Acosta,* 19 I. & N.

14

Dec. 211, 233 (BIA 1985)). In *In re Fauziya Kasinga*, 21 I. & N. Dec. 357 (BIA 1996), the BIA found that "young women who are members of the Tchamba-Kunsuntu Tribe of northern Togo who have not been subjected to female genital mutilation, as practiced by that tribe, and who oppose the practice" are a particular social group. Furthermore, at least one IJ has determined that young men who have been actively recruited by gangs and who have refused to join the gangs are members of a "particular social group." In an unpublished decision, IJ Susan Castro concluded that the petitioner, D-V-, was eligible for asylum based on his persecution by gang members on account of his membership in the particular social group of those who "have been actively recruited by gangs, but who have refused to join because they oppose the gangs." *In re D-V-*, slip op. at 10 (IJ Castro, Sept. 9, 2004), http://www.refugees.org/ uploadedFiles/Participate/National_Center/Resource_Library/ H.002.pdf. There was no appeal by the Attorney General from this ruling.

We will remand so that the agency can address the issues that it did not reach as a result of denying Galdamez's asylum claim for lack of evidence of a causal "nexus" between his injuries and membership in a particular social group: whether the group identified by Galdamez is a "particular social group" within the meaning of the Act, and whether the injuries that Galdamez suffered rise to the level of persecution. *See INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam).

15

### 3. Countrywide Fear of Persecution

The third ground upon which the IJ denied Galdamez's application for asylum was his alleged failure to show that the danger of persecution he faces is countrywide. App. 12 ("Based on the evidence before me I cannot find that the respondent has shown countrywide persecution."). The IJ noted that Galdamez relocated briefly to Santa Rosa de Cupon for three months to live with his mother and "lived quietly without any incidents and without any evidence that the Mara group sought to harm him or sought to recruit him to become [a] member of this group." App. 21.

However, if Galdamez establishes that he was subject to past persecution, it is not his burden to prove that it would not be reasonable for him to relocate to another part of Honduras. "[A]n alien who offers credible testimony regarding past persecution is presumed to have a well-founded fear of future persecution." *Berishaj v. Ashcroft*, 378 F.3d 314, 326 (3d Cir. 2004). When an asylum applicant has demonstrated past persecution and thus is presumed to have a well-founded fear of future persecution, the government may rebut this presumption by proving by a preponderance of the evidence that the applicant "could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under all the circumstances, it would be reasonable to expect the

16

applicant to do so." 8 C.F.R. § 208.13(b)(1)(i)(B).[4] Thus, if the agency determines on remand that Galdamez has established past persecution, the burden is on the government to show that Galdamez can safely relocate.

Furthermore, we again note that the IJ failed to consider several important pieces of evidence in the process of making this finding. Galdamez testified that, even while he was living in Santa Rosa, he feared that he would be targeted by the gang members. The IJ also ignored Galdamez's testimony that he did not leave his house while in Santa Rosa because he was "afraid that the groups may find [him]." App. 180. In addition, the IJ did not make any reference to the United Nations report on Honduras in the record, which describes the gang problem in Honduras as countrywide. The report states that "[t]here are several youth gangs in Honduras. Dominant among them are the 'Mara Salvatrucha' (better known as MS). . . . The gangs operate throughout the country but are more visible in the urban centres of Tegucigalpa and San Pedro Sula." App. 249. Thus, this finding by the IJ is suspect and is not supported by substantial evidence.

---

[4]"In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecutor is a government or is government-sponsored." 8 C.F.R. § 208.13(b)(3)(i).

17

## B. Withholding of Removal

The IJ denied Galdamez's application for withholding for removal because Galdamez had failed to prove his eligibility for a grant of asylum. App. 21 ("Inasmuch as the respondent has failed to satisfy the lower burden of proof required for asylum it follows that he has failed to satisfy the clear probability standard of eligibility for withholding of removal."). However, since we conclude that the IJ erred in deciding that Galdamez failed to prove his eligibility for a grant of asylum, we accordingly also vacate the denial of Galdamez's application for withholding for removal.

## C. Relief Under the Convention Against Torture

Galdamez also argues that the IJ erred in denying his application for relief under the CAT because she ignored evidence that Galdamez would be tortured by gang members if he returned to Honduras and that the government would be unwilling or unable to prevent the torture. Torture is defined in the CAT as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of *or with the consent or acquiescence of a public official or other person acting in an official capacity*." 8 C.F.R. § 208.18(a)(1) (emphasis added).

As we explained above, the IJ failed to note that the police ignored five reports filed by Galdamez concerning violence and threats by gang members. This could arguably constitute government "acquiescence" to torture as we now

18

know it. We note that in *Matter of S-V-,* 22 I. & N. Dec. 1306 (BIA 2000), the BIA had interpreted the use of the word "acquiescence" in the Act to require an alien to prove that the government approves of the torture, or that it consents to it. Here, the IJ found that Galdamez's CAT claim failed because he did not prove "that he would be tortured by the government of Honduras or anyone else with the acquiescence of the government" if he returned to Honduras. App. 22. However, after the IJ denied Galdamez's claim, we opined in *Silva-Rengifo v. Attorney General,* 473 F.3d 58 (3d Cir. 2007) that the BIA's reading of "acquiescence" in *Matter of S-V-* was too narrow, and held that "acquiescence to torture requires only that government officials remain willfully blind to torturous conduct and breach their legal responsibility to prevent it." *See Silva-Rengifo,* 473 F.3d at 70. Accordingly, because the IJ ignored relevant evidence, and in light of the current standard for proving government "acquiescence" to torture, we will vacate the denial of Galdamez's claim for relief under the CAT.

## III.

For the foregoing reasons, we will grant the petition for review, vacate the denial of Galdamez's applications for asylum, withholding of removal, and relief under the CAT, and remand to the agency for further proceedings consistent with this opinion.

19