**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4219
_____

JOSEPH DONALD DIXON MALNAIDELAGE,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A088-187-652)
Immigration Judge:  Honorable Annie S. Garcy
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
June 16, 2011

Before: MCKEE, Chief Judge, SMITH and GARTH, Circuit Judges

(Opinion filed:  June 17, 2011)
_____

OPINION
_____

PER CURIAM

    Joseph Donald Dixon Malnaidelage seeks review of a decision of the Board of

Immigration Appeals ("BIA") denying his application for asylum, withholding of

removal, and protection under the Convention Against Torture ("CAT").  For the following reasons, we will deny his petition for review.

I.

Malnaidelage, a citizen of Sri Lanka, entered the United States in January 2006, and was served with a notice to appear in August 2007, after overstaying his visa.  See 8 U.S.C. § 1227(a)(1)(B).  He conceded removability but filed an application for asylum, withholding of removal, and protection under the CAT, claiming that he feared persecution and/or torture by the Sri Lankan government based on his membership in the United National Party ("UNP") and because he had distributed posters criticizing the Sri Lankan President.

Malnaidelage and his brother have been active in the UNP since 1991, and his brother has run as a UNP candidate, or as a candidate for a party related to the UNP, four times since then.  At a December 2, 2008 hearing before an Immigration Judge ("IJ"), Malnaidelage testified to two incidents that form the bases of his claims for relief.  The first incident occurred on October 15, 2000, shortly after a general election won by the People's Alliance ("PA"), a political party that is apparently not aligned with the UNP.  Ten "strangers" set fire to Malnaidelage's shrimp farm, poisoned the shrimp, tied up his employees, and told those employees to tell Malnaidelage to leave the UNP or they would kill him and "destroy his family."  (R. 122, 174.)  At the time, Malnaidelage was at his home in Waikkal, 28 kilometers away from the farm.

2

Malnaidelage filed a complaint with the police in the town where his farm was located, but they would not investigate because Malnaidelage could not establish that he owned the property, as he did not have a deed to the farm. He then filed a complaint with the police in Waikkal but they also did not investigate. Malnaidelage later learned that the government took over the property where his farm had been located.

Despite the 2000 incident, Malnaidelage remained active in the UNP, as did his brother. Prior to the 2005 presidential election, Malnaidelage distributed posters criticizing Mahinda Rajapaksa, the presidential candidate for the opposing party, for mishandling funds intended for tsunami relief. On November 22, 2005, after Rajapaksa won the election, ten to fifteen "strangers" came to Malnaidelage's home and broke down his front door, looking for him. (R. 127-28.) Malnaidelage was staying with a friend at the time, but learned from his neighbor that the perpetrators were carrying automatic weapons and had arrived in vehicles similar to those used by the army. Around the same time, Malnaidelage moved his family in with his brother.

Malnaidelage testified that his brother's best friend, Joseph Michael Perera, one of the local UNP leaders, investigated the matter and learned that President Rajapaksa had become aware of Malnaidelage's posters. Accordingly, Malnaidelage believes, and therefore claims, that the President instructed his Presidential Security Division ("PSD") – a group of police and army personnel and "underworld thugs" who support the President – to abduct and kill him. (R. 245; see also R. 130.) Malnaidelage later fled to

the United States; his family is still living with his brother in Sri Lanka.

Malnaidelage's brother remained active in the UNP and ran in a 2006 election. After losing that election, he was threatened and his business was burned. Furthermore, Malnaidelage has been informed by his wife and neighbor that "some strangers," whom he believes are acting on behalf of the government, have come by his home in white vans, searching for him. (R. 131, 134; see also R. 181.) He testified that, if returned to Sri Lanka, he fears that he would be arrested, tortured, and killed. In support of his claims, Malnaidelage submitted affidavits from his wife, his brother, Perera, and a local priest; a copy of the police report he filed after the 2000 incident; and articles and reports concerning country conditions in Sri Lanka.

The IJ denied Malnaidelage's asylum application as untimely based on his concession that he filed it after having been in the United States for over a year. (R. 20, 139-40.) Next, the IJ denied Malnaidelage's withholding of removal claim, finding that he failed to establish that he experienced past persecution; that the perpetrators of the 2000 and 2005 incidents were linked to the Sri Lankan government; or that it was more likely than not that he would be subject to persecution if returned to Sri Lanka. The IJ also denied Malnaidelage's CAT claim and, accordingly, ordered him removed to Sri Lanka.

On appeal, the BIA concluded that Malnaidelage waived his asylum claim by failing to challenge the IJ's untimeliness ruling. The BIA affirmed the IJ's denial of

4

withholding of removal, adopting the IJ's reasoning for denying that claim, and affirmed the denial of CAT relief since Malnaidelage failed to establish that it was more likely than not that he would be tortured with the consent or acquiescence of the Sri Lankan government upon return. Malnaidelage filed a timely petition for review challenging the denial of all of his claims.

## II.

We have jurisdiction to review the BIA's denial of withholding of removal and CAT relief pursuant to 8 U.S.C. § 1252.[1] Although we generally review only the BIA's decision, Chavarria v. Gonzalez, 446 F.3d 508, 515 (3d Cir. 2006), we have authority to review the IJ's decision to the extent it was adopted by the BIA. Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir. 2004). "The IJ's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Valdiviezo-Galdamez v. Att'y Gen., 502 F.3d 285, 288 (3d Cir. 2007). However, we exercise de novo review over the agency's legal conclusions. Huang v. Att'y Gen., 620 F.3d 372, 379 (3d Cir. 2010). Since the IJ did not make an explicit finding as to Malnaidelage's credibility, we proceed assuming Malnaidelage's testimony was credible. Kayembe v. Ashcroft, 334 F.3d 231, 235 (3d Cir. 2003).

Malnaidelage challenges the IJ's denial of withholding of removal, arguing that he

---

[1] Although Malnaidelage did not challenge the denial of his CAT claim on appeal to the BIA, we have jurisdiction to consider that claim because the BIA sua sponte addressed and rejected it. Lin v. Att'y Gen., 543 F.3d 114, 123-24 (3d Cir. 2008).

5

established both past persecution and that he would likely be persecuted if he were returned to Sri Lanka. To establish eligibility for withholding of removal, an alien must establish a "clear probability" that he will be persecuted based on a protected ground if returned to his native country. See Chen, 376 F.3d at 223 (quotations omitted); see also 8 U.S.C. § 1231(b)(3). An alien meets that standard by establishing that he has been persecuted in the past, which creates a rebuttable presumption of future persecution, or by showing that it is more likely than not that he will be persecuted in the future. See Kaita v. Att'y Gen., 522 F.3d 288, 296 (3d Cir. 2008). The alleged persecution must be "committed either by the government or by forces that the government is either unable or unwilling to control." Toure v. Att'y Gen., 443 F.3d 310, 316-17 (3d Cir. 2006) (quotations omitted).

Substantial evidence supports the IJ's conclusion that Malnaidelage did not establish past persecution because he was subject only to unfulfilled threats that did not result in physical harm to him or his family.[2] See Li v. Att'y Gen., 400 F.3d 157, 164 (3d Cir. 2005) (explaining that "[t]hreats standing alone . . . constitute persecution in only a

_____

[2] In discounting the 2000 incident, the IJ heavily relied on the fact that Malnaidelage and his family were not harmed between 2000 and 2005, even though they continued living in the same home. (R. 30.) However, Malnaidelage testified that he was, for the most part, hiding with friends after the 2000 incident. Although the IJ appeared skeptical of that testimony, she did not explicitly reject it. Furthermore, as the IJ acknowledged, Malnaidelage was working on a ship from October 2002 through March 2003, and from September 2003 through July 2005. Despite those facts, the IJ's conclusion is substantially supported because Malnaidelage's family remained in the home until November 2005, and there is no evidence that they were threatened or

6

small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm") (quotations omitted and alterations in original).  Furthermore, nothing in the documentary evidence suggests that President Rajapaksa's government specifically targets either individuals in the UNP or those who are critical of its handling of tsunami relief efforts.[3]

Substantial evidence also supports the IJ's conclusion that Malnaidelage failed to establish that the Sri Lankan government perpetrated the 2000 and 2005 incidents, or that the Sri Lankan government is unwilling or unable to control the perpetrators. Malnaidelage presented no evidence linking the "strangers" who burned his farm to the government, and it was reasonable for the IJ to conclude that the failure of police to investigate and the government's takeover of the property did not necessarily establish persecution in light of the fact that Malnaidelage did not own the land on which the farm was located.  See Lie v. Ashcroft, 396 F.3d 530, 536 (3d Cir. 2005) (criminal acts perpetrated by unknown assailants do not constitute persecution).  Furthermore, the IJ reasonably questioned whether the 2005 incident was perpetrated by the PSD.  Neither Malnaidelage nor the neighbor who witnessed the incident could identify the perpetrators

---

harmed, or that anyone came by the home in search of Malnaidelage during that period.

[3] The record provides little explanation of the relevant political parties.  It does, however, indicate that the UNP is the "main opposition party" to the government.  (R. 160.)  Additionally, Malnaidelage submitted an article from 2001, concerning a police crackdown on protests organized by the UNP against the president at that time, who was a member of the PA party.  (R. 221-22.)

7

and Perera – the only potential link – makes no mention of the poster or his investigation of the incident in his affidavit.

The record also supports the IJ's finding that Malnaidelage failed to establish a clear probability that he would be persecuted in the future. First, as noted above, nothing in the documentary evidence concerning conditions in Sri Lanka suggests that Malnaidelage would be subject to persecution if he returned. Second, the IJ's finding that the government is not currently looking for Malnaidelage is supported by substantial evidence. Notably, Malnaidelage essentially acknowledged that he could not identify the people who have been stopping by his home. (R. 134.) Finally, as observed by the BIA, the fact that Malnaidelage's brother and family have not been physically harmed since his departure minimizes the likelihood that Malnaidelage will be persecuted.

Malnaidelage also challenges the BIA's rejection of his CAT claim. To succeed on that claim, Malnaidelage must establish by objective evidence "that it is more likely than not that [he] will be tortured if removed to [Sri Lanka], and that such torture will occur with the consent or acquiescence of the government." Gomez-Zuluaga v. Att'y Gen., 527 F.3d 330, 349 (3d Cir. 2008). Malnaidelage falls short of establishing a CAT claim given his failure to adequately link the Sri Lankan government – or a group that the Sri Lankan government is unable or unwilling to control – to the individuals who targeted him in the past or those who have been looking for him since his departure. He also failed to proffer evidence, apart from his subjective beliefs, that would compel a finding

8

that he would be subject to torture if he were returned to Sri Lanka. 8 C.F.R. § 1208.18(a) (defining torture, in relevant part, as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" exclusive of "lesser forms of cruel, inhuman or degrading treatment or punishment.").

For the foregoing reasons, we deny Malnaidelage's petition for review.