NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2781
No. 12-3897
_____

MIGUEL ANGEL ULLOA SANTOS
a/k/a
HARRY WILSON MENDEZ,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent
_____

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board No. 098-245-031)
Immigration Judge:  Dorothy Harbeck
_____

Argued September 25, 2013
Before:  AMBRO, FISHER and HARDIMAN, *Circuit Judges*.

(Filed: January 15, 2014)

Aaron C. Esty (Argued)
Amelia Wilson
American Friends Service Committee
89 Market Street, 6th Floor
Newark, NJ 07102
        *Attorney for Petitioner*

1

Holly M. Smith (Argued)
Remi Da Rocha-Afodu
Stuart F. Delery
Blair T. O'Connor
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
      *Attorney for Respondent*

_____

OPINION
_____

HARDIMAN, *Circuit Judge*.

Miguel Angel Ulloa Santos petitions for review of an order by the Board of Immigration Appeals (BIA) denying his application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). For the reasons that follow, we will grant the petition for review as to Ulloa's asylum and withholding of removal claims, but will deny it as to his claim for CAT protection.

I

A native and citizen of El Salvador, Ulloa entered the United States in May 2005 without inspection. He lived and worked here undetected for almost four years, during which time he married a United States citizen and returned at least once to El Salvador. On April 30, 2009, Ulloa was detained by Department of Homeland Security (DHS) officials after attempting to reenter the United States with a fraudulent United States passport. DHS promptly initiated removal proceedings against Ulloa, and he was found

2

removable. Ulloa then submitted an application for asylum and withholding of removal under sections 208(a)(1) and 241(b)(3) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1158(a)(1), 1231(b)(3), and for protection under Article III of the CAT pursuant to 8 C.F.R. § 1208.16(c)(2). He claimed a well-founded fear of persecution on account of his membership in two particular social groups: "Salvadorans who have lived and worked in the United States" and "the family unit of Mr. Ulloa Santos and the family members closely associated with him."

At his ensuing removal hearing, Ulloa testified that he feared persecution by members of the 18th Street Gang (Dieciocho). Shortly after Ulloa arrived in the United States, his ex-wife, children, and two sisters informed him that Dieciocho had gained control over their neighborhood in El Salvador and demanded "rent payments." When Dieciocho discovered that Ulloa had moved to the United States, it levied a $15 to $20 per month "rent" against the family, threatening to hurt them if he failed to pay. When Ulloa was unable to pay, gang members broke into his children's home. As part of an ongoing cycle of intimidation, gang members fired shots at his sister's home and have threatened to recruit his nephew into Dieciocho.

According to Ulloa's expert witness, Dr. Thomas Boerman, gangs target Salvadorans who have relatives in the United States because they are perceived to be wealthy and to have access to resources. Boerman explained that "extortion is one of the [gangs'] primary vehicles for generating income" and that gangs are "willing to look at

3

any group that represents a viable target." Failure to pay would be perceived as a sign of disrespect and result in escalating violence against the individual and his family.

Ulloa testified that his family has been targeted specifically by two Dieciocho bosses, Dennis and Mongo, whom he had known as teenagers. Before coming to the United States, Ulloa had regularly encountered Dennis and Mongo on his way to work; when they demanded money, he would give them "a quarter or something" to appease them. After Ulloa moved to the United States, Dennis and Mongo repeatedly asked his sister whether and when "El Colocho"—a reference to Ulloa's distinctive curly hair— would return. Dennis also informed Ulloa's sister that Dieciocho had killed many of Ulloa's friends and that he was the "only one that's missing." In 2007, Dieciocho killed one friend, Moises, who had refused to pay rent. Although Moises had never been to the United States, he was considered wealthy because he owned a store. Another friend, Robert, who had lived in the United States as a teenager and spoke English, was killed because he "didn't have the money." Other friends, identified as Steve, "El Mulato," and "El Lapis," were also killed for failing to make rent payments. Ulloa fears that he too will be killed if returned to El Salvador.

Because of persistent threats and harassment by the gang, Ulloa returned to El Salvador in March 2009 to relocate his family to a neighborhood that he later learned is controlled by Dieciocho's rival gang, the Mara Salvatrucha. As Boerman testified, this move may have further provoked Dieciocho's ire, as relocating to a rival's "jurisdiction"

4

demonstrates disrespect. Ulloa's children are now afraid to leave their home. While the police have responded to the family's requests for help, Ulloa believes the police and the Salvadoran government are unable or unwilling to control the gangs.[1] Ulloa's ex-wife testified that he faces death if he returns to El Salvador, his sister claimed that Ulloa has received death threats, and his brother expressed fear for his life because of his resemblance to Ulloa.

Although the Immigration Judge (IJ) found Ulloa credible, she denied his application for relief. The IJ's decision relied in part on her determination that Ulloa's proposed social groups—Salvadorans who have lived and worked in the United States, and his family unit—did not have legal significance under the INA because they lacked "social visibility" and were not readily recognized as distinct groups in Salvadoran society. Ulloa appealed the IJ's decision to the BIA, which, on May 30, 2012, dismissed the appeal and issued a final order of removal. Ulloa filed a timely petition for review (No. 12-2781).

While Ulloa's appeal was pending with the BIA, we decided *Valdiviezo-Galdamez v. Attorney General* (*Valdiviezo II*), 663 F.3d 582 (3d Cir. 2011), which rejected the

---

[1] Boerman testified that the Salvadoran government has mounted an offensive against gangs, termed the "Mano Dura" ("heavy hand") policy. While the strategy reflects the government's commitment to confronting gang violence, the Salvadoran government has publicly acknowledged it as a failure.

BIA's use of "social visibility"[2] and "particularity"[3] as factors in recognizing social groups under the INA. Ulloa filed a motion urging the BIA to reconsider its decision in light of *Valdiviezo II*, arguing that the BIA's decision included a social group analysis that we invalidated. On September 18, 2012, the BIA denied Ulloa's motion for reconsideration, finding *Valdiviezo II* inapposite to its decision, and Ulloa timely appealed (No. 12-3897). Ulloa's petitions were consolidated for our review.[4]

## II

The BIA's ruling[5] is "conclusive unless manifestly contrary to the law and an

---

[2] The "social visibility" inquiry asked whether a proposed group is perceived as distinct in society such that "potential persecutors in fact see persons sharing the [applicant's social group] characteristic as warranting suppression or the infliction of harm." *In re R-A-*, 22 I. & N. Dec. 906, 918 (BIA 1999).

[3] The "particularity" factor aimed to assess whether a proposed group had definable boundaries that would render it a distinct class of persons in society. *Matter of S-E-G-*, 24 I. & N. Dec. 579, 584 (BIA 2008).

[4] The BIA had jurisdiction to review the IJ's order in the removal proceeding under 8 C.F.R. § 1003.1(b)(3). The BIA's authority to reconsider its decision was governed by 8 C.F.R. § 1003.2(a) & (b). We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review a final order of removal.

[5] Ulloa urges us to review both the IJ and BIA's decisions, arguing that the BIA's succinct opinion amounts to an implicit adoption of the IJ's order. We disagree. Generally, "because the BIA has the power to conduct a *de novo* review of IJ decisions . . . the 'final order' we review is that of the BIA." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001). When the BIA issues a separate opinion, we review the BIA's disposition and look to the IJ's ruling only insofar as the BIA defers to it. *Chavarria v. Gonzalez*, 446 F.3d 508, 515 (3d Cir. 2006). Here, the BIA conducted a de novo review of the record and provided its own, albeit sparse, reasoning for all claims. We thus review only the BIA's decision.

abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). We consider whether the BIA's findings of fact are supported by substantial evidence from the record considered as a whole. *Abdille v. Ashcroft*, 242 F.3d 477, 483–84 (3d Cir. 2001). This standard is very deferential, and we reverse on a factual error only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003). A reviewing court may not supplant an agency's findings merely by identifying alternative findings that could be supported by substantial evidence. *See Pa. Funeral Dirs. Ass'n, Inc. v. Fed. Trade Comm'n*, 41 F.3d 81, 85–86 (3d Cir. 1994). Rather, "judicial review of an agency's decision is limited to the rationale that the agency provides." *Konan v. Att'y Gen.*, 432 F.3d 497, 501 (3d Cir. 2005).

We review questions of law de novo but accord deference to the BIA's interpretation of the INA under the standard established by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir. 2004).

III

Ulloa claims entitlement to a remand of his asylum claim, contending that the BIA's decision was not supported by sufficient evidence and that it relied on erroneous legal standards.

Section 208 of the INA gives the Attorney General discretion to grant asylum to a

7

removable alien who is deemed a "refugee," which in relevant part is defined as:

> [A]ny person who is outside any country of such person's nationality . . . and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). Accordingly, to qualify for asylum as a refugee, Ulloa must establish persecution "on account of" one of the five statutory grounds. *See Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002).

In denying Ulloa's application for asylum, the BIA provided only a cursory explanation, concluding in three sentences that Ulloa "has failed to establish that a protected ground will be at least one central reason for persecuting him" (internal quotation marks and alterations omitted). *See* 8 U.S.C. § 1158(b)(1)(B)(i). It acknowledged that Ulloa feared harm from gang members "because he will be perceived as wealthy based on his ties to the United States, and because he disrespected them when his family refused to pay extortion money and moved to a new neighborhood," but found "such acts by criminals are not persecution 'on account of' one of the protected grounds" required for asylum. The BIA's denial of Ulloa's motion for reconsideration clarified that its initial decision rested on Ulloa's failure to establish the requisite nexus: "how ever [sic] [Ulloa's] proposed particular social group was defined, [he] failed to adequately establish that a central reason for the harm he feared would be *on account of* group membership" (emphasis added).

Ulloa makes three principal arguments in support of remand: (1) the BIA could not adequately assess the nexus requirement because it did not evaluate the cognizability of his proposed social groups; (2) the BIA's decision rested on case law that has been invalidated by our decision in *Valdiviezo II*; and (3) the BIA lacked substantial evidence to support its finding that the harm Ulloa feared did not rise to the level of persecution and that he would not be persecuted "on account of" a protected ground. We address each in turn.

A

Ulloa contends that the BIA erred when it failed to first determine whether his proposed social groups were cognizable under the INA. We disagree. Contrary to Ulloa's assertion, we have never established such a per se rule, and have found applicants ineligible for asylum for lack of the nexus requirement alone. *See, e.g.*, *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 134 (3d Cir. 2009); *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 345 n.10 (3d Cir. 2008). In *Gomez-Zuluaga*, for example, we declined to consider whether the applicant's proposed social group—"Colombian women who have the shared past experience of relationships with military and police men"—constituted a protected ground under the INA, as we determined that petitioner was targeted for another reason: her potential skills as a health professional. *Id.* at 340, 345 (alteration in original omitted). Gomez-Zuluaga had been abducted and detained by members of a Colombian rebel group that strategically intimidated civilians, including women who fraternized with

9

members of the Colombian government. *Id.* at 335, 336–38. We found it "*not necessary to determine whether* [Gomez-Zuluaga's proposed group] is a cognizable 'particular social group' under the statute, because there is substantial evidence . . . that the [rebel group] was not motivated by [her] membership in a particular social group . . . [but instead] by a desire to recruit her." *Id.* at 345 n.10 (emphasis added).

Ulloa's argument to the contrary relies on two cases, neither of which precluded the BIA's nexus-only review in this case. First, he cites *Valdiviezo-Galdamez v. Attorney General*, 502 F.3d 285, 291 (3d Cir. 2007) (*Valdiviezo I*), where we vacated and remanded when the BIA made a no-nexus finding but failed to rule on the applicant's proposed social groups. *Valdiviezo I* involved an applicant who alleged he would face future persecution on account of his membership in the group "young Honduran men who have been actively recruited by gangs and who have refused to join the gangs." *Id.* at 290. We held that the IJ erred when he acknowledged that Valdiviezo's "refusal [to be recruited] caused him to be attacked by [gang members]" but nevertheless found that his proposed injuries were not caused by his group status. *Id.* (alteration in original omitted). We thus remanded for the BIA's evaluation of the particular social group element not because it failed to do so in the first instance, but because we found that Valdiviezo had established a nexus such that he might still be eligible for asylum. *Id.* at 291. The second case Ulloa cites, *Konan*, instructs only that the BIA must evaluate each particular social group proposed by an applicant. In *Konan*, we remanded when the IJ considered only

10

one of the applicant's two proposed social groups, noting that the IJ's determination that Konan was not persecuted on account of his political opinion did not compensate for its failure to consider whether he was targeted because of his status as the family member of an Ivorian gendarme. *Konan*, 432 F.3d at 501. Although we have made clear that the BIA must evaluate whether characteristics of each proposed group could constitute "a central reason" for the applicant's purported harm, *see id.*, it does not follow that the INA requires the BIA to determine the legal cognizability of each proposed group before proceeding to the nexus analysis.

B

Ulloa also argues that the BIA's decision rested on an improper legal standard, as it relied on case law we invalidated in *Valdiviezo II*. In that case, we rejected the BIA's application of the "social visibility" and "particularity" elements when determining whether an applicant's proposed groups could be recognized as "particular social groups" under the INA, finding that this requirement was an inconsistent, unprincipled departure from prior BIA practice. *See Valdiviezo II*, 663 F.3d at 604 (citing *INS v. Cardozo-Fonseca*, 480 U.S. 421, 446 n.30 (1987)). We acknowledge that it is increasingly difficult to distinguish between the nexus and social group analyses, especially as applicants define proposed social groups with an eye to the motives of their persecutors. *See In re R-A-*, 22 I. & N. Dec. 906, 918 (BIA 1999) (noting that the group "appears to have been defined principally, if not exclusively, for purposes of this asylum case"). But

11

we find *Valdiviezo II* irrelevant to the BIA's analysis in Ulloa's case. Here, the BIA

clarified in its denial of Ulloa's motion for reconsideration that it never made a

"particular social group" determination. While the BIA cited cases that include social

group findings considered at great length and rejected in *Valdiviezo II*—*Matter of A-M-E-*

*& J-G-U-*, 24 I. & N. Dec. 69 (BIA 2007); *Matter of E-A-G-*, 24 I. & N. Dec. 591 (BIA

2008); and *Matter of S-E-G-*, 24 I. & N. Dec. 579 (BIA 2008)—it relied only on the

nexus determinations of these decisions. Accordingly, we hold that the BIA need not

reevaluate its decision in light of *Valdiviezo II*.


C

Nonetheless, we agree with Ulloa's contention that there are logical gaps in the

BIA's reasoning, rendering it difficult to ascertain the bases for its decision.

Accordingly, we will remand Ulloa's asylum claim to the BIA for further clarification.

Accepting the BIA's explanation that its decision rested on the absence of a nexus, its

opinion suffers from a dearth of specific facts from Ulloa's case.[6] The BIA's decision

references only two specifics—that Ulloa may be "perceived as wealthy" because of his

ties to the United States, and that he has "disrespected" the gang—and conclusorily finds

---

[6] Because we analyze only the BIA's no-nexus finding, we do not reach Ulloa's
argument that the BIA incorrectly determined that his feared harm did not rise to the level
of "persecution."

12

that Ulloa has not established the requisite elements for asylum. It is possible that the BIA found Dieciocho was motivated only by economic gain, which in itself is insufficient to establish the nexus requirement. *See, e.g.*, *Matter of V-T-S-*, 21 I. & N. Dec. 792, 799 (BIA 1997) (finding that where "[t]he common trait shared by the victims of kidnappings . . . is wealth, i.e., their ability to pay large ransoms," the applicant did not demonstrate that persecution was on account of an enumerated ground); *see also Abdille*, 242 F.3d at 494 (denying asylum because assailants were motivated not by "animosity against a particular ethnic group" but "by a desire to reap financial rewards"). But the BIA did not explicitly cite this theory, nor did it clearly articulate any basis for its no-nexus finding. Furthermore, the BIA's cursory explanation glosses over specific threats against Ulloa in the record that may not be tied to general violence and lawlessness: for example, that five of Ulloa's friends have been killed, and that gang members have repeatedly informed his family they intend to kill Ulloa when he returns to El Salvador. *Cf. Ali v. Holder*, 637 F.3d 1025, 1031 (9th Cir. 2011) (remanding where the BIA "did not conduct an individualized analysis"). Absent further explanation, we cannot meaningfully review whether the BIA properly determined that Dieciocho did not target Ulloa "on account of" the characteristics of his proposed groups. *See Marshall v. Lansing*, 839 F.2d 933, 944 (3d Cir. 1988) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.")

13

(citation and internal quotation marks omitted).

In sum, because the BIA provided inadequate reasoning for its no-nexus finding, we will remand Ulloa's asylum claim for further explanation consistent with this opinion.[7]

IV

Ulloa also urges us to remand his application for relief under Article III of the CAT, claiming that the BIA failed to conduct a meaningful review of his claim. The BIA dismissed Ulloa's CAT claim in one sentence, finding:

> [T]here is insufficient evidence in the record to establish that the respondent faces a probability of "torture," as defined by 8 C.F.R. § 1208.18(a), by or with the consent or acquiescence (to include the concept of willful blindness) of an official of the Salvadoran government, so as to qualify him for CAT protection.

Despite the BIA's limited explanation, we find sufficient evidence in the record to support the two grounds for its decision: first, that Ulloa is not "more likely than not" to face harm amounting to the legal definition of "torture" under the CAT, *see Sevoian v. Ashcroft*, 290 F.3d 166, 174–75 (3d Cir. 2002); and second, that the Salvadoran government has not "acquiesced" in Dieciocho's activities. *See* 8 C.F.R. § 1208.18(a)(1) ("torture" requires consent, acquiescence, or instigation by a government official).

Ulloa's concerns, though legitimate, do not constitute "torture" under the CAT, as

---

[7] Because the withholding of removal issue rests on the same facts, it follows that Ulloa is entitled to a remand on his claim for that relief as well. *See Huang v. Att'y Gen.*, 620 F.3d 372, 388 n.10 (3d Cir. 2010).

his family has not suffered serious injury. *Cf. Valdiviezo II*, 663 F.3d at 609–10 (deferring to the BIA's finding that the applicant faced only "harassment" and not "torture" when gang members seriously beat, threatened, and shot at him). And even assuming *arguendo* that Ulloa's feared harms constitute torture, there is factual support for the BIA's finding that the Salvadoran government has not "acquiesced" or "remain[ed] willfully blind" to gang activity. *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 70 (3d Cir. 2007). Indeed, Ulloa testified that the police had responded to his family's requests for help, and the Salvadoran government has made significant, albeit unsuccessful, efforts to combat gangs with a "tough hand"—hardly the "government acquiescence" that implicates relief under the CAT.

Because Ulloa has not established the necessary elements for CAT protection, we will deny the petition for review as to his CAT claim.

V

For the reasons stated, we will grant the petition for review as to Ulloa's asylum and withholding of removal claims and remand to the BIA for proceedings consistent with this opinion. Ulloa's petition for review as to his CAT claim will be denied.